[887 NE2d 1113, 858 NYS2d 55]

OLEG RIVKIN, Appellant, v CENTURY 21 TERAN REALTY LLC et al., Respondents, et al., Defendants.

Argued March 19, 2008; decided April 24, 2008

## POINTS OF COUNSEL

*Robert J. Tolchin,* New York City, for appellant. I. Real estate brokers' fiduciary duties to their clients include the same duty of undivided loyalty any other agent owes his principal. (*Dubbs v Stribling & Assoc.,* 96 NY2d 337; *Sonnenschein v Douglas Elliman-Gibbons & Ives,* 96 NY2d 369; *Coldwell Banker Residential Real Estate v Berner,* 202 AD2d 949.) II. Defendants seek an exemption from the duty of loyalty enjoyed by no other species of agent. III. The amicus' reliance on *Sonnenschein v Douglas Elliman-Gibbons & Ives* (96 NY2d 369 [2001]) is misplaced.

*Hiscock & Barclay, LLP,* Albany (*William A. Hurst* and *Stephen H. Volkheimer* of counsel), for respondents. I. The fiduciary duty owed by Century 21 Teran Realty LLC and Joshua Luborsky to plaintiff did not include a duty to disclose Teran's simultaneous representation of two potential buyers of the same property. (*Manhattan Apts., Inc. v Simeon,* 11 AD3d 404; *Bucholtz v Sirotkin Travel,* 80 Misc 2d 333; *Matter of L. A. Grant Realty v Cuomo,* 58 AD2d 251; *Dubbs v Stribling & Assoc.,* 96 NY2d 337; *Reiser, Inc. v Roberts Real Estate,* 292 AD2d 726; *Sonnenschein v Douglas Elliman-Gibbons & Ives,* 96 NY2d 369; *Lamdin v Broadway Surface Adv. Corp.,* 272 NY 133; *Matter of Ted is Back Corp. [Roberts],* 64 NY2d 725; *Bynog v Cipriani Group,* 1 NY3d 193; *Matter of 12 Cornelia St. [Ross],* 56 NY2d 895.) II. Plaintiff cannot demonstrate that his damages were proximately caused by defendants' breach of their fiduciary duty. (*Gibbs v Breed, Abbott & Morgan,* 271 AD2d 180; *Milbank, Tweed, Hadley & McCloy v Boon,* 13 F3d 537; *Douglas Holly, Inc. v Rice,* 161 AD2d 560, 76 NY2d 709; *E. W. Bruno Co. v Friedberg,* 28 AD2d 91; *Fine v Doernberg & Co.,* 203 AD2d 419.)

*Law Offices of Michael T. Wallender,* Albany (*Michael T. Wallender* of counsel), for New York State Association of REALTORS, Inc., amicus curiae. I. In the contemporary New York real estate marketplace, absent an express agreement, buyer's brokers are not generally expected to represent a particular buyer client exclusively. (*Sonnenschein v Douglas Elliman-Gibbons & Ives,* 96 NY2d 369; *Thyroff v Nationwide Mut. Ins.*

*Co.*, 8 NY3d 283; *Dubbs v Stribling & Assoc.*, 96 NY2d 337; *Wendt v Fischer*, 243 NY 439; *Reiser, Inc. v Roberts Real Estate*, 292 AD2d 726; *Glazer v LoPreste*, 278 AD2d 198; *Van Valkenburgh, Nooger & Neville v Hayden Publ. Co.*, 30 NY2d 34, 409 US 875.) II. Plaintiff should bear the burden of establishing an exclusive agreement which provided that the firm would represent no other buyer clients interested in similar properties. (*Sonnenschein v Douglas Elliman-Gibbons & Ives, Inc.*, 96 NY3d 369; *Lane—Real Estate Dept. Store v Lawlet Corp.*, 28 NY2d 36; *Graff v Billet*, 64 NY2d 899.) III. Plaintiff should bear the burden of establishing causation of any claimed damages. (*Alvarado v Miles*, 9 NY3d 902; *Gibbs v Breed, Abbott & Morgan*, 271 AD2d 180; *Douglas Holly, Inc. v Rice*, 161 AD2d 560, 76 NY2d 709.)

**OPINION OF THE COURT**

READ, J.

The United States Court of Appeals for the Second Circuit has certified a question that calls upon us to explore the scope of the fiduciary duty owed by buyer's agents affiliated with a real estate brokerage firm when their principals bid on the same property. We begin with the facts, which are substantially undisputed.

I.

On May 24 or 25, 2004, Oleg Rivkin, a New Jersey resident who was in the market for a summer home on Ulster Heights Lake in Ulster County, contacted Century 21 Teran Realty LLC, a real estate brokerage firm located in Woodstock, New York. Teran is co-owned by Andrew Peck and Chloe Dresser, who are both licensed real estate brokers (*see* Real Property Law § 440 [1]). Teran also possesses a broker's license, which allows it to receive commissions in connection with the purchase and sale of real estate (*see id.*; Real Property Law § 440-a). At the time, 16 salespersons and four associate brokers worked under Teran's aegis (*see* Real Property Law § 440 [2], [3]; § 440-a).

Rivkin spoke with Joshua Luborsky, one of Teran's associate brokers, who told him about lakeside property at 103 Camp Road in Ellenville, which was listed for sale by another Century 21 franchise for $100,000. Details and pictures of the property posted by the local multiple listing service were forwarded to Rivkin by e-mail. The listing indicated that "all reasonable offers" for this modest cottage on one acre, which "[sat] right on the lake," should be presented.

On May 25, 2004, Rivkin directed Luborsky to convey a verbal offer to the listing broker (the seller's agent) to purchase the Camp Road property for $75,000, and Luborsky promptly did so. According to Rivkin, until he actually saw the property, he "couldn't commit to . . . a contract[,] but at the same time [he] was very concerned that somebody was going to beat [him] out of [the property]." He authorized the verbal offer "to keep [his] spot" so that he would not find himself "out of the loop." Luborsky and Rivkin also arranged to meet at the site on May 28, 2004, the Friday before the impending Memorial Day holiday weekend, so that Rivkin might look at the property, with the expectation that he would make a written offer if it proved to be as suitable as he believed it to be.

Upon actually viewing the Camp Road property, Rivkin formed the opinion that "[t]he building . . . was fairly worthless" and "dilapidated [and] needed to be knocked down"; and that the "value was entirely in the land [which was] fantastic." As he later put it, this property "seemed to fit [his] requirements in every respect."

Rivkin knew that the Camp Road property "had only been on the market . . . a couple of weeks," but he quizzed Luborsky about "whether there had been other offers on the property." According to Rivkin, Luborsky replied that there had been other offers and, although he was "not aware of the amounts[,] . . . they were low enough not to have resulted in any counteroffers by the sellers." Rivkin asked Luborsky if he considered $75,000 to be "a fair offer," and Luborsky indicated that it was, and that a counteroffer was likely. Rivkin agreed with Luborsky's assessment because "[i]n [his] experience there [was] always an offer and counteroffer process." Further, he claims to have told Luborsky that he "was willing to go up to the asking price without any doubt," because "[a]s far as [he] was concerned[,] the land was worth it."

Rivkin then signed a written binder, offering to purchase the Camp Road property for $75,000, which Luborsky forwarded to the listing broker that same day, May 28, 2004. Rivkin also wrote a check to Teran for $1,500 as a deposit, and signed an acknowledgment that he had received, read and understood a form document entitled "Disclosure Regarding Real Estate Agency Relationships" provided to him by Luborsky. This document, mandated by and conforming to the requirements of article 12-A of the Real Property Law, states that the "buyer's agent acts solely on behalf of the buyer" and has "without

limitation, the following fiduciary duties to the buyer: reasonable care, undivided loyalty, confidentiality, full disclosure, obedience and a duty to account" (*see also* former Real Property Law § 443 [4]).

As it turns out, on May 20, 2004, a few days before Rivkin first talked to Luborsky, Susanne and Robert Martin, who were looking to buy vacation or retirement property in Ulster County, had contacted Dresser, the co-owner of Teran. She told them about the Camp Road property, and they scheduled an appointment to meet at the site for an inspection. When Dresser called the listing broker on May 28, 2004 to arrange for this viewing, the listing broker let her know that there was an offer pending (presumably, Rivkin's), and that there might be several other showings over the holiday weekend. Upon seeing the Camp Road property, the Martins decided to offer $100,000, the listing price. On Sunday, May 30, 2004, they signed a written binder for that amount. Dresser promptly called the listing broker to advise her of this offer, and forwarded the written binder.

Luborsky contacted the listing broker on Saturday, May 29, 2004 to make sure that she had received Rivkin's written binder faxed the previous day. The listing broker confirmed that she had, but "would likely have trouble reaching" the sellers because they were traveling over the holiday weekend. As a result, she told Luborsky not to expect a response to Rivkin's offer any sooner than the following Tuesday, June 1, 2004, and that the property "might be shown to others over the weekend."

Rivkin says that he called Luborsky on Sunday, May 30 and Monday, May 31 (Memorial Day), 2004 to inquire about the status of his offer. Luborsky claims to have told him everything that he had learned in his Saturday conversation with the listing broker, and Rivkin acknowledges at least that "at some point . . . [Luborsky] told [him] that the property had been shown over the weekend."

According to Rivkin, on June 1, 2004 Luborsky told him that he had learned from the listing broker that offers had been received for the Camp Road property over the weekend, but that he did not know the particulars. Rivkin maintains that he reminded Luborsky that he wanted the opportunity to raise his $75,000 offer, and was prepared to do so; and that Luborsky assured him that he would try to find out from the listing broker whether the sellers were prepared to make a counteroffer, or wanted to receive "highest and best" final offers from all prospective purchasers.

At 4:57 P.M. on June 1, 2004, Rivkin sent Luborsky the following e-mail:

> "What have you heard from the sellers' agent? Anything? I don't quite understand why it is taking so long to get a response from them. If they have changed their mind or don't want to entertain the offer, I would like to know now, so that I could make an offer on another property."

Sometime late in the afternoon or early evening, Luborsky picked up a voice mail message from the listing broker, who informed him that the sellers had accepted another offer, and so his client was "out of the running." When Luborsky reported this to Rivkin, they commiserated about the loss and wondered why the sellers had not solicited a "highest and best" offer. According to Rivkin, Luborsky expressed the notion that the listing broker had "acted inappropriately" by steering the sale to one of its own clients.

At about 11:00 P.M. on June 1, 2004, Rivkin telephoned Carol Botnick, one of the sellers, to make sure that the listing broker had conveyed his $75,000 offer. Botnick, who co-owned the Camp Road property with her brother-in-law, Seymour Kraver, confirmed that she had received Rivkin's offer. When he asked her why there was no counteroffer, she replied that she "had a better offer" and that Rivkin's offer "was too low," but she would not tell him what the better offer was. When he asked "what [it] would . . . take" for him to acquire the property, she told him to deal with the listing broker, and not to call her again. Despite this rebuff, Rivkin next telephoned Kraver at about 11:15 P.M., telling him that he "really like[d] the property, . . . how much the property meant to [him], how much the lake meant to [him]." Kraver shrugged Rivkin off, telling him that the decision was "basically" Botnick's to make.

Rivkin claims to have talked to the listing broker at some point on June 2, 2004, and to have learned from her that the sellers had received a full-price offer, which they had accepted orally. According to Rivkin, she made the following statement: "I don't know if I should be telling you this, but . . . the full-price offer came from your own broker's office." Rivkin also says that he confronted Luborsky with this information on June 2, 2004, before instructing him to present an offer of $101,000 to the sellers, contingent only upon a water well inspection. He sent Luborsky an e-mail confirming this offer at 2:13 P.M. That same day, the listing broker informed Dresser that the sellers

had verbally accepted the Martins' $100,000 offer, and let Luborsky know that the sellers had rejected Rivkin's $101,000 offer.

After Luborsky informed Rivkin that his $101,000 offer had been turned down and—"for the first time"—that the offer with which he was competing was contingency-free, Rivkin responded by e-mail at 7:32 P.M., instructing Luborsky to make an offer of $105,000, with no contingencies. Immediately thereafter, Rivkin telephoned Kraver to make the $105,000 offer personally. Kraver told Rivkin that he would consider it, but again left him with the impression that the decision was his sister-in-law's.

On June 3, 2004, Rivkin contacted the listing broker directly to confirm the $105,000 offer, which the sellers ultimately turned down. He professes to have learned from the listing broker that Dresser was the buyer's agent for the successful purchaser, although the listing broker would not reveal the purchaser's identity. In an e-mail sent to Luborsky at 9:39 P.M., Rivkin terminated his relationship with Teran, and asked for his deposit to be returned. He told Luborsky that he had just spoken to Kraver, "who did not give [him] any explanation" for rejecting the $105,000 offer, and that he was "frankly quite puzzled and not a little disappointed by all of this." He expressed his suspicion, however, that Peck (who co-owned Teran with Dresser) was the buyer.

On June 3, 2004, Rivkin's attorneys wrote to Peck, describing what they characterized as the "rather disturbing sequence of events [that] has transpired . . . , demonstrating a blatant breach by [Teran] of its fiduciary duty to . . . Rivkin, as well as actions evidencing [Teran's] egregious conflict of interest and self-dealing." Rivkin's attorneys threatened litigation. On June 6, 2004, Rivkin wrote to the listing broker to ask for certain documents. He complained that his "offer was trumped by a full-price, no contingency offer from one of Teran's principals, in violation of their fiduciary duty to me."

Teran had no system in place for tracking whether its buyer's agents were representing multiple buyers bidding on the same property. According to Dresser, until Peck received the June 3rd letter from Rivkin's attorneys, she had no idea that Luborsky had made a competing offer for the Camp Road property. Peck was similarly unaware that Luborsky and Dresser were representing different buyers bidding on the Camp Road prop-

erty, although he stressed that "[i]t is common practice in New York for buyer's-agents associated with a particular agency to assist a buyer-client in purchasing a property, while another buyer's-agent associated with the same agency is doing the same thing."

Later in June 2004, Rivkin brought this suit against Teran, Peck, Dresser and Luborsky (collectively, defendants) in the United States District Court for the Northern District of New York, seeking damages stemming from the loss of the Camp Road property, and, as relevant to the certified question, asserting a claim for breach of fiduciary duty. After discovery, Rivkin moved for partial summary judgment on the issue of liability, and defendants moved for summary judgment dismissing the complaint.

On November 17, 2005, the District Court Judge granted defendants' motion and dismissed the case in an oral decision. By this time, Rivkin knew that the Martins[1] —not Peck—had purchased the Camp Road property. As the Judge analyzed Rivkin's revised theory of the case, "the gist of the legal issue" was whether or not there was "a per se rule that under circumstances like this, two employees of the same agency cannot, absent full disclosure, represent competing buyers for a piece of property." Observing that "there [was] not a single case in New York on these facts that has held that kind of conduct in the real estate industry violates the law," he "decline[d] to so hold." He also considered it to be

> "probably unnecessary . . . to even reach that issue, because on the facts, as everybody concedes them, there simply is no basis whatsoever to associate the harm in the representation from Luborsky to the harm to [Rivkin] from losing the property. They were all avenues available had the sellers of the property wanted to . . . sell him the property at the price he was willing to pay."

Rivkin appealed to the Second Circuit. Concluding that the case "turn[ed] on an unsettled question of state law for which there [was] no direct precedent," the court stated that

> "[t]he issues . . . concern the nature and extent of

---

1. The Martins signed a contract for the purchase of the Camp Road property on June 11, 2004, which was evidently executed by the sellers, Botnick and Kraver, on June 25, 2004; the closing occurred on August 18, 2004.

a buyer's agent's obligation to avoid or mitigate conflicts of interest among its principals. It is clear that buyer's agents owe various fiduciary duties to their clients under New York's property law. . . .

"Although in [*Dubbs v Stribling & Assoc.*, 96 NY2d 337 (2001)] the New York Court of Appeals made the general statement that it is well settled that a real estate broker is a fiduciary with a duty of loyalty and an obligation to act in the best interests of the principal, *Dubbs* addressed the duties of seller's agents rather than buyer's agents.

"Indeed, it appears that no New York case deals with a *buyer's*—rather than a seller's—agent's duties. The real estate marketplace may, for various reasons, dictate different duties for these two kinds of agents. In addition, even if we were to presume that sellers' and buyers' agents owe identical fiduciary duties, the facts of the New York cases that deal with sellers' agents' duties are materially different from those here: *Dubbs*, for example, involved allegations of an improper personal stake in the transaction, and *Sonnenschein [v Douglas Elliman-Gibbons & Ives* (96 NY2d 369 [2001])] addressed whether a seller's broker may offer the properties of all of its principals to a potential customer. Thus, these cases neither answer the questions in this case nor can be used with confidence to reasonably predict the answer" (*Rivkin v Century 21 Teran Realty LLC*, 494 F3d 99, 106-107 [2d Cir 2007] [internal quotation marks and citations omitted]).

Further, "causation analysis will turn on the type of disclosure that New York law requires a buyer's agent to make" (*id.* at 107). Consequently, the Second Circuit certified the following question to us: "Did any or all of [defendants] breach a fiduciary duty to Rivkin by failing to disclose, in any form, [defendants'] representation of a competing buyer for the property Rivkin sought to buy?" (*Id.* at 108.)

## II.

"The trend of [real estate agents] representing buyers began primarily on the west coast in the mid-1980's when states enacted the first agency disclosure laws making the practice viable" (Brown, Grohman and Valcarcel, *Real Estate Brokerage:*

*Recent Changes in Relationships and a Proposed Cure*, 29 Creighton L Rev 25, 42 [1995]). New York's agency disclosure statute, Real Property Law § 443, was originally enacted in 1991 (*see* L 1991, ch 726). This legislation sought "to address an issue of paramount concern to the Secretary of State"; specifically, although brokers and salespersons were required to make clear whether they represented the seller—as was traditionally the case—or the buyer in a residential sales transaction, "[t]he lack of a requirement that the information be provided in writing and in a uniform manner . . . resulted in uneven disclosure which too often . . . failed to eliminate confusion on the part of buyers or sellers as to the loyalties and duties of agents with whom they [were] dealing" (Assembly Mem in Support, Bill Jacket, L 1991, ch 726, at 16). Section 443 mandates disclosure for transactions involving one-to-four-family residential dwellings for sale or lease, but not condominium or cooperative apartments in a building with more than four units (Budget Report on Bills, *id.* at 11; Real Property Law § 443 [1] [f]).

The statute defines a "buyer's agent" as "an agent who contracts to locate residential real property for a buyer or who finds a buyer for a property and presents an offer to purchase to the seller or seller's agent and negotiates on behalf of the buyer" (Real Property Law § 443 [1] [c]). A buyer's agent must present the buyer with a disclosure form, the terms of which are statutorily prescribed, "prior to entering into an agreement to act as the buyer's agent" and generally must "obtain a signed acknowledgment from the buyer" (Real Property Law § 443 [3] [c]). As previously noted, the form declares that the buyer's agent "acts solely on behalf of the buyer" and has "without limitation, the following fiduciary duties to the buyer: reasonable care, undivided loyalty, confidentiality, full disclosure, obedience and a duty to account" (*see also* former Real Property Law § 443 [4]).[2]

Rivkin places great weight on the words "solely" and "undivided" and the phrase "without limitation," arguing, in

---

2. Section 443 has been amended twice since 2004, when the events described in this appeal took place (*see* L 2006, ch 569; L 2007, ch 549). The 2006 amendments resulted in the splitting of subdivision (4) of section 443 into paragraphs (a) (dealing with buyer-seller transactions) and (b) (dealing with landlord-tenant transactions), and made some minor changes in wording with respect to buyer's agents, apparently for the sake of clarity. Those changes included deletion of the sentence stating that "[a] buyer's agent acts solely on behalf of the buyer."

effect, that they bespeak the Legislature's determination, or at least its recognition, that a brokerage firm may not represent multiple bidders for the same property without disclosure and consent. We disagree. When the Legislature adopted section 443, the perceived mantle of "confusion" obscured consumers' awareness as to whether a real estate broker or salesperson was acting in the interest of the seller or the buyer or both (i.e., dual agency) in a particular transaction, not whether a broker-age firm might represent multiple buyers (or sellers) with competing interests. Indeed, the disclosure form specifically states that the fiduciary duty is owed by an individual licensee and not the firm; that is, section 443 talks in terms of an "agent," defined as *"a person* who is licensed as a real estate broker or real estate sales associate . . . and is acting in a fidu-ciary capacity" (*see* Real Property Law § 443 [1] [a] [emphasis added]). The Legislature did not, for example, say "any person, firm, limited liability company or corporation," as it did when defining the term "real estate broker" in subdivision (1) of sec-tion 440.

Subdivision (6) of section 443, however, preserves "the com-mon law of agency with respect to residential real estate transactions." And in *Sonnenschein* and *Dubbs*—the two cases prominently mentioned by the Second Circuit—we explored a real estate broker's fiduciary duty under the common law with respect to sellers. Looking to other jurisdictions, we concluded in *Sonnenschein* that "[o]nce oral negotiations have commenced between a seller and a potential purchaser concerning a real estate transaction, . . . the brokerage firm that produced the potential purchaser [does not] owe the seller a duty to refrain from showing the potential purchaser additional properties" (96 NY2d at 372). We considered "this approach to be consistent with the nature and fundamental requirements of the real estate marketplace in New York," reasoning that

> "a broker cannot be expected to decline a prospec-tive purchaser's request to see another property listed for sale with that broker. Any other rule would unreasonably restrain a broker from simultaneously representing two or more principals with similar properties for fear of violating a fiduciary obligation in the event a buyer chose the property of one principal over that of another. Similarly, such a limitation would frustrate the interests of sellers, who benefit from the opportunity to market their

properties to as many potential purchasers as possible, as well as the interests of potential buyers, who often request exposure to a number of properties in order to select the one most suitable to their needs and budget" (*id.* at 376).

In *Dubbs*, the owners/sellers placed their apartment for sale on an "open listing," which meant that the sellers would pay a commission to the broker who located the buyer. The sellers confided to their real estate agent that, rather than selling the apartment, they would have preferred to keep it, purchase the adjacent apartment and combine the two into a single unit, but that their neighbor refused to sell. The real estate agent showed the apartment to several prospective buyers. Thereafter, she made an offer on the apartment herself, and the parties entered into a written contract for its sale. Prior to closing, the real estate agent contracted to buy the adjacent apartment without advising the sellers that it had been placed on the market.

The sellers commenced an action against their real estate agent claiming that she had breached her fiduciary duty to them by failing to let them know that their neighbor's apartment was for sale. We observed that "[w]here a broker's interests or loyalties are divided due to a personal stake in the transaction or representation of multiple parties, the broker must disclose to the principal the nature and extent of the broker's interest in the transaction or the material facts illuminating the broker's divided loyalties" (*Dubbs*, 96 NY2d at 340). We determined, however, that the broker/principal relationship and accompanying fiduciary duty was severed before the agent learned that the neighbor's apartment was on the market.

Although *Dubbs* addressed the duty of a seller's agent, rather than a buyer's agent, our observation in *Dubbs* that "[w]here a broker's interests or loyalties are divided due to . . . [the] representation of multiple parties, the broker must disclose to the principal . . . the material facts illuminating the broker's divided loyalties" bears on agency relationships generally (*Dubbs*, 96 NY2d at 340; *see* Restatement [Second] of Agency § 389 ["Unless otherwise agreed, an agent is subject to a duty not to deal with his principal as an adverse party in a transaction connected with his agency without the principal's knowledge"]). Concomitantly, a buyer's agent must inform the buyer of the duty of "undivided loyalty . . . [and] full disclosure" (Real Property Law § 443 [3] [c]; [4] [a]). Simultaneously representing multiple buyers with respect to the same property

is inconsistent with these duties, absent disclosure and consent. Further, section 443 (4) (a) of the Real Property Law creates an expectation that a buyer's agent will, in fact, not at one and the same time take the side of different buyers bidding for the same property.

That being said, in *Sonnenschein* we adopted a rule "consistent with the nature and fundamental requirements of the real estate marketplace in New York" (96 NY2d at 376). Here, practical considerations cause us to draw a distinction between the fiduciary duty owed by the buyer's *individual* agent and that owed by the agent's *firm*. An individual buyer's agent acting on behalf of multiple clients bidding on the same property cannot negotiate an optimal purchase price for all of them. The buyers' interests conflict; the agent's representation is inevitably compromised. But two buyer's agents simply affiliated with the same real estate brokerage firm and acting on behalf of different buyers bidding on the same property generally do not present comparable risks. There is no incentive for these agents to represent their clients less than zealously, consistent with their fiduciary duties under Real Property Law § 443 (4) (a) and common law: they only earn commissions for sales to their own clients. As a result, in this situation the agents have every reason to negotiate in their clients' best interest.

As the New York State Association of REALTORS, Inc. (NYSAR) points out in its amicus brief, in today's real estate marketplace buyers are routinely represented by buyer's agents, and real estate licensees are commonly affiliated with megabrokerage firms featuring multiple licensees and offices. Indeed, NYSAR avows that numerous brokerage firms in New York have more than 100 or 200—and, in three cases, more than 1,000—affiliated licensees. Would-be buyers are very well aware that they are competing with other potential buyers, including those represented by other agents affiliated with the firm that they have retained. As we noted in *Sonnenschein* when discussing seller's agents, "[u]nless a broker and principal *specifically agree otherwise,* a broker cannot be expected to decline a prospective purchaser's request to see another property listed for sale with that broker" (96 NY2d at 376 [emphasis added]). As a corollary, unless a real estate brokerage firm and principal specifically agree otherwise, the firm is not obligated to insure that its affiliated licensees forgo making offers on behalf of other buyers for property on which the principal has already bid. Disclosure and consent are not prerequisites to a competing

offer in this circumstance. An individual agent, however, may not represent multiple buyers bidding on the same property without making disclosure and obtaining consent.

Accordingly, the certified question should be answered in the negative.

Chief Judge KAYE and Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur.

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the negative.