OPINION OF THE COURT
Beverly S. Cohen, J.
The issue presented by this motion is whether under Arts and Cultural Affairs Law § 12.01 the publisher and seller of prints is an art merchant, as defined in the statute, who holds the prints and the proceeds from their sale in trust for the benefit of the artist. This issue has never been addressed by any other court.
The plaintiffs in this case are the internationally acclaimed pop artist, Tom Wesselmann, his wife, and a corporation wholly owned by them. The defendants are Hugh MacKay, his estranged wife Karla MacKay, a corporation owned by them, International Images, Inc. (III), and several corporate entities owned and controlled by Karla MacKay. It is alleged that Ms. MacKay’s corporate entities may possess and may have sold some of the art created by Mr. Wesselmann.*
Plaintiffs and defendants III and Mr. MacKay, respectively, move and cross-move for partial summary judgment on the complaint’s second cause of action pursuant to section 12.01 of the Arts and Cultural Affairs Law. They seek a ruling as to whether the limited edition prints of Mr. Wesselmann’s work published by III were consigned to III and whether the prints and the proceeds of their sale constitute trust funds in defendants’ hands for the benefit of plaintiffs.
This court has already granted a preliminary injunction enjoining defendants from selling or otherwise dealing with Mr. Wesselmann’s artwork during the pendency of this action. In addition, the court directed that the artwork subject to the preliminary injunction be moved to a warehouse in New York City for safekeeping, after Ms. MacKay secreted a large *249 amount of the artwork in a warehouse in Florida. The artwork remains there.
The essential facts are not in dispute. The MacKays, through III, were the publishers and sellers of all of Mr. Wesselmann’s limited edition prints from 1988 until November of 1993. Their agreement, dated August 25, 1988, was for an even split between the artist, Mr. Wesselmann, and the publisher, III, of the gross profits minus certain expenses:
"On all sales of your works, published by us, the gross profit after expenses of advertising, printing, freight, paper, and related printing expenses, but not sales and travel expenses, will be divided equally (50% / 50%) between us * * *
"A recapitulation of sales, expenses, and monies due will be created on a monthly basis. Payment based upon collected sales will be included with the recapitulation, which will be submitted by us within 30 days after the end of the month which it represents.” (Moving affidavit of Tom Wesselmann, sworn to on July 5, 1996 [Wesselmann Affidavit], exhibit E.)
In 1993, the MacKays were in the process of obtaining a divorce and the agreement was terminated by Mr. Wesselmann because of the MacKays’ personal and financial difficulties. At the end of 1993, the MacKays prepared a statement showing that as of December 31, 1993 they owed Mr. Wesselmann $334,187.16 on account of sales of prints.
The process by which most of Wesselmann’s multiple editions were created was that a maquette of an image created by Mr. Wesselmann and a color chart were delivered to a printer hired by the MacKays. Sometimes Mr. Wesselmann would deliver to the printer a painting or a lithographic plate drawn on by Mr. Wesselmann with a color chart. The image was always one conceived by Mr. Wesselmann.
The printer would fashion the metal screens from which the prints would be made, or would work from a lithographic plate drawn on by Mr. Wesselmann. Mr. Wesselmann would approve a trial print. The printer would then "pull” or print the edition. After the prints were made, Mr. Wesselmann would sign the ones he approved of to be sold by III.
The parties agree that it is not customary for the artist to actually pull the prints. A professional printer is usually, and in Mr. Wesselmann’s case, always hired for this purpose.
Arts and Cultural Affairs Law § 12.01 (1) provides that:
"(a) Whenever an artist * * * delivers or causes to be delivered * * * a print of his own creation to an art merchant *250 for the purpose of exhibition and/or sale on a commission, fee or other basis of compensation, the delivery to and acceptance thereof by the art merchant establishes a consignor / consignee relationship as between such artist * * * and such art merchant with respect to the said work, and:
"(i) such consignee shall thereafter be deemed to be the agent of such consignor with respect to the said work;
"(ii) such work is trust property in the hands of the consignee for the benefit of the consignor;
"(iii) any proceeds from the sale of such work are trust funds in the hands of the consignee for the benefit of the consignor;
"(iv) such work shall remain trust property notwithstanding its purchase by the consignee for his own account until the price is paid in full to the consignor; provided that, if such work is resold to a bona fide third party before the consignor has been paid in full, the resale proceeds are trust funds in the hands of the consignee for the benefit of the consignor to the extent necessary to pay any balance still due to the consignor and such trusteeship shall continue until the fiduciary obligation of the consignee with respect to such transaction is discharged in full; and
"(v) no such trust property or trust funds shall be subject or subordinate to any claims, liens or security interest of any kind or nature whatsoever.”
An art merchant is defined in Arts and Cultural Affairs Law § 11.01 (2) as: "a person who is in the business of dealing, exclusively or non-exclusively, in works of fine art or multiples, or a person who by his occupation holds himself out as having knowledge or skill peculiar to such works, or to whom such knowledge or skill may be attributed by his employment of an agent or other intermediary who by his occupation holds himself out as having such knowledge or skill.”
In addition, the statute uses the terms "print” and "multiple” interchangeably: " 'Print’ in addition to meaning a multiple produced by, but not limited to, such processes as engraving, etching, woodcutting, lithography and serigraphy, also means multiples produced * * * from photographic negatives”. (Arts and Cultural Affairs Law § 11.01 [14].) " 'Visual art multiples’ or 'multiples’ means prints * * * and similar art objects produced in more than one copy and sold, offered for sale or consigned * * * for an amount in excess of one hundred dollars”. (Arts and Cultural Affairs Law § 11.01 [20].)
Mr. MacKay argues that the statute is inapplicable here because a publisher is not an art merchant. According to Mr. *251 MacKay, a merchant must purchase and sell, ergo, one who publishes and sells cannot be an art merchant.
The statutory language cannot support such a construction. The words buy and sell are simply not in the statute. All that is required is that the art merchant either deal, exclusively or nonexclusively, in multiples, or that the art merchant, or his or her agent or intermediary, holds him or herself out as having knowledge or skill peculiar to such works.
Defendants do not dispute that they sold Mr. Wesselmann’s prints. This can only be characterized as dealing in multiples. Moreover, by claiming to be publishers who arranged and supervised the printing of limited editions, they are clearly holding themselves or their printers out as having the knowledge or skill relating to printing limited editions. In fact, their position on the prior motion for a preliminary injunction was that Mr. Wesselmann’s success was largely attributable to the MacKay s’ skill and efforts in both printing and selling the limited editions.
Next Mr. MacKay urges that there was no delivery by Mr. Wesselmann to III. He makes this argument by focusing exclusively on the point in time when Mr. Wesselmann delivered the maquette, painting, or lithograph to the printer. He then concludes that there was no delivery of a print of Mr. Wesselmann’s own creation because the print had not yet been made.
However, Mr. MacKay does not dispute that Mr. Wesselmann approved and signed the finished prints before they were sold. This constitutes delivery. Whether Mr. Wesselmann delivered the prints to defendants or to the printer employed by the defendants is a distinction without significance because the statute specifically provides that the consignment relationship arises whenever the artist "delivers or causes to be delivered” a print of his own creation.
Mr. MacKay claims that the prints were not of Mr. Wesselmann’s own creation because they were created by the publishing process. The multiples are prints of Mr. Wesselmann’s own creation because the term "artist” as applied to multiples is defined as "the person who conceived or created the image which * * * constitutes the master from which the individual print was made.” (Arts and Cultural Affairs Law § 11.01 [1].) Here there is no dispute that Mr. Wesselmann conceived the images for all of the masters. It would be absurd to hold that III is the artist.
Defendants argue that their financial investment in publishing the prints renders the consignment and trust provi *252 sions of section 12.01 inapplicable. The statute provides that the consignor/consignee relationship arises whenever the artwork is delivered for the purpose of sale "on a commission, fee or other basis of compensation”. (Arts and Cultural Affairs Law § 12.01 [1] [a] [emphasis supplied].) Here, the undertaking by defendants to deduct certain expenses and not others before dividing the sales price with Mr. Wesselmann is simply another basis of compensation.
The financial investment of III does not negate the consignment or trust relationship because it is not full payment for the prints. The statute specifically provides that: "such work shall remain trust property notwithstanding its purchase by the consignee for his own account until the price is paid in full to the consignor”. (Arts and Cultural Affairs Law § 12.01 [1] [a] [iv].) The clear intent of the statute is to create a trust relationship even when the art merchant makes a financial investment in the art.
Moreover, it is undisputed that Ms. MacKay admitted in an affidavit, sworn to on December 10, 1993, filed in the MacKays’ divorce proceeding that the prints are held by III on consignment and constitute trust funds pursuant to statute: "As a result of Mr. MacKays’s recent bizarre behavior, Mr. Wesselmann has terminated his agreement with III and has repossessed the works of art previously consigned by him in trust to III, effectively terminating Ill’s business. Moreover, Mr. Wesselmann has already or is about to commence a law-suit against III. (1) for recovery of the proceeds derived from the sale of his art work by III, which proceeds, by statute are deemed to constitute trust funds.”
Finally, Mr. MacKay posits that a finding that the statute applies to III deprives III of its property without due process of law. There has been no taking without due process of law. Ill has had its day in this court, but has lost. Ill’s claim for its share of the profits upon the sale of the prints still remains to be determined.
Mr. MacKay’s own affidavit makes a compelling case for the applicability of the statute. He states that the purpose of section 12.01 is to protect the artist who delivers a finished work of art to a gallery in return for a promise to pay a commission. He then states that "galleries make no advances or payments in full or otherwise upon delivery, and because many galleries have unscrupulously sold works and never paid the Artist, Arts and Cultural Affairs Law sec. 12.01-l(a) became necessary.” Here, it is not denied that III never paid in full for the *253 prints, and, in fact, never paid Mr. Wesselmann his share of sales totalling over at least $300,000.
The court notes that there is no showing that either Mrs. Wesselmann or Tom Wesselmann Studios, Inc., owns the art created by Mr. Wesselmann. Neither of them signed the agreement with III. The fact that the corporate plaintiff is owned by Mr. and Mrs. Wesselmann, without more, does not establish ownership rights of either the corporation or Mrs. Wesselmann.
Accordingly, plaintiffs’ motion for summary judgment on the second cause of action is granted solely to the extent of granting summary judgment on liability in favor of plaintiff Tom Wesselmann and against all defendants, and in all other respects the motion is denied. Tom Wesselmann is entitled to the return from defendants of all artworks created by him that are in defendants’ possession, custody or control, other than artworks bought by defendants from independent third parties. Such artworks and the proceeds from sales of such artworks are trust funds in the hands of defendants for the benefit of Tom Wesselmann. The cross motion for summary judgment on the second cause of action by defendants Hugh MacKay and International Images, Inc., is denied with prejudice.

 Ms. MacKay, Dedicated Arts, Ltd., Karla MacKay Graphics, Inc., and Karla MacKay Editions have defaulted on the motion.