[983 NYS2d 219]

Paula Scher, Respondent-Appellant, v Stendhal Gallery, Inc., et al., Appellants-Respondents.

First Department, March 27, 2014

### APPEARANCES OF COUNSEL

*Wollmuth Maher & Deutsch LLP*, New York City (*Michael C. Ledley* and *Melissa A. Finkelstein* of counsel), for appellants-respondents.

*Carter Ledyard & Milburn LLP*, New York City (*Judith M. Wallace, Jeffrey L. Loop* and *Michael H. Bauscher* of counsel), for respondent-appellant.

### OPINION OF THE COURT

FRIEDMAN, J.

██ The primary issue on this appeal is whether plaintiff Paula Scher, an artist, or defendant Stendhal Gallery, Inc. (the Gallery), Scher's former exclusive agent, owns 320 fine-art silkscreen prints made from Scher's paintings that remained unsold upon the termination of the parties' relationship.[1] Pursuant to an oral agreement between the parties, the prints had been fabricated, with Scher's close collaboration, by a printer hired and paid by the Gallery. Although the motion court adopted Scher's contention that the question of the ownership of the prints is resolved in her favor by Arts and Cultural Affairs Law § 12.01, as construed in *Wesselmann v International Images* (172 Misc 2d 247 [1996], *affd* 259 AD2d 448 [1st Dept 1999], *lv dismissed* 94 NY2d 796 [1999]), we affirm the declaration that Scher owns the prints on a different ground. Specifically, the parties' initial written agreement provided that the Gallery would act as Scher's "exclusive agent" in matters relating to, inter alia, any future deal "for the exhibition and sales of . . . limited edition prints published exclusively by [the] [G]allery" during the term of the agreement. Thus, when the Gallery purchased the finished prints from the printer, it did so as Scher's agent. Accordingly, the parties' written agreement establishes as a matter of law that the prints are to be treated as Scher's property.

---

1. In this action, Scher is suing the Gallery along with several of its predecessors-in-interest, as well as Harry Stendhal, the Gallery's principal. All defendants are referred to collectively in this writing as "the Gallery."

In the 1990s, Scher, a nationally known graphic designer, began to create fine-art paintings. Between 1998 and 2005, she produced a series of 12 map-based acrylic-on-canvas paintings known as the Map I paintings. Scher and the Gallery entered into a written agreement, dated October 18, 2005 (the 2005 agreement), that provided for the consignment and sale of the Map I paintings and any future works Scher might create during its term, as well as a broader "exclusive agen[cy]" relationship between the parties encompassing, inter alia, any publication of limited-edition prints of Scher's paintings during the agreement's term. In 2006 and 2007, while the 2005 agreement was in effect, Scher produced seven additional map-based paintings (the Map II paintings), which were consigned to the Gallery pursuant to the 2005 agreement.

Section 1 of the 2005 agreement provides in pertinent part:

> "1. Scope of Agency. The Artist [Scher] appoints the Gallery *to act as Artist's* [X] *exclusive agent* in the following geographic area: Exclusive worldwide *for the exhibition and sales of* artworks in the following media: original paintings/ Works on Paper /*limited edition prints published exclusively by [G]allery* and Digital / electronic art for computers.

> "Publishing. The [G]allery will publish a full color catalogue to accompany the exhibit and will act as the artist's agent to put forth a book deal based on 'The Maps.' In the event of a publishing deal, a separate agreement will be furnished to the artist." (Emphases added.)

Pursuant to section 2 of the 2005 agreement, the agreement was to have a term of three years from its date, although it is undisputed that the parties continued to operate under it for about 4½ years, until May 11, 2010, when Scher's counsel sent the Gallery a letter terminating the relationship. Section 2 of the 2005 agreement also provides that, upon termination or expiration of the agreement, "all works consigned hereunder" are to be returned to Scher. Section 4 provides that the Gallery "shall receive a commission of 50% percent [sic] of the retail price of each work sold," a rate that, it is undisputed, applied to paintings but not to prints. Finally, section 11 provides: "All modifications of this Agreement must be in writing and signed by both parties. This Agreement constitutes the entire understanding between the parties hereto."

As noted, the 2005 agreement contemplated that, during its term, the scope of the Gallery's agency for Scher would extend

to the production and sale of any "limited edition prints" based on Scher's works. It is undisputed that, while the 2005 agreement was in effect, Scher reached an oral agreement with nonparty Maya Stendhal, then one of the Gallery's principals, concerning prints of Scher's paintings. Scher granted the Gallery an oral license to produce ink-on-paper silk-screen prints based on the Map I and Map II paintings, at the Gallery's expense, and to sell the prints, with the proceeds to be split 90% to the Gallery, 10% to Scher.[2]

The Gallery engaged a printing company headed by Alexander Heinrici, a prominent fine-art printer, to make the prints. Scher worked closely with the printer in the production of the prints, a process that the parties agree was not one of simple reproduction. The prints, which were much smaller in size than the original paintings, were the result of what Scher described at her deposition as "a back and forth collaborative process" between herself and the printer, involving the fabrication of printing plates based on the original paintings and the choice of ink colors to approximate the paint colors of the original works. Ultimately, Scher approved and signed each numbered individual print to be sold.[3] Scher, however, admittedly had no contractual relationship with the printer; the Gallery hired and paid the printer and took delivery of the finished prints from the printer. In January 2012, the Gallery claimed that it had incurred costs of $299,163 in producing and selling the prints, which by that time had generated sales of $1,388,680.[4] Nonetheless, as of the time this action was commenced, the Gallery had paid Scher only $15,000 on account of print sales.[5]

---

**2.** Notwithstanding the absence of any written modification of the 2005 agreement's provision that the Gallery would receive a 50% commission on "the retail price of each work sold," Scher admits in her complaint and other submissions that the share of print sales to which she is entitled is 10%. On appeal, neither side challenges the motion court's determination that a triable issue of fact exists as to whether Scher's 10% share of print sales is based on gross revenue or on revenue net of production costs.

**3.** It appears from the record that the prints were advertised for sale at prices ranging from $3,500 to $15,000 each.

**4.** In a June 2011 affidavit, the Gallery's principal, Harry Stendhal, estimated that the total costs incurred in producing and marketing the prints were "likely more than $500,000."

**5.** Scher disparages the Gallery's claim to have paid for the production of the prints and to have borne the risk of financial loss in the event the prints did not sell well. She points out that the production costs were financed, at least in substantial part, by pre-release sales. She also argues that the Gallery's claim to have paid for the prints is inconsistent with its position that

By letter dated May 11, 2010, Scher's counsel notified the Gallery that both the 2005 agreement and the oral license to create and sell prints of the Map I and Map II paintings were terminated, and demanded, among other things, that the Gallery return to Scher all of her unsold paintings and prints. The following month, Scher commenced this action against the Gallery and its principal, Harry Stendhal, in Supreme Court, New York County. Scher's complaint asserts numerous causes of action, seeking, among other relief, recovery of Scher's unpaid share of the sales of her paintings and prints, replevin of the unsold prints, and an accounting. In January 2011, Supreme Court ordered that the unsold prints be placed in the possession of an independent escrow agent pending determination of which party owns them.

In April 2011, after the parties had conducted discovery, Scher moved for partial summary judgment declaring, inter alia, that she is the owner of the unsold prints and that she is entitled to recover "the full list price for all Scher Prints sold by the Gallery after May 11, 2010 [the date Scher terminated her agreements with the Gallery] and for all undocumented transfers and missing prints." Scher's motion also sought a ruling on a claim (not pleaded in the complaint) concerning one of the Map I paintings (*Long Island*), and a declaration that she was entitled to an accounting.[6] The Gallery opposed the motion and cross-moved, in pertinent part, for partial summary judgment declaring that "the Gallery is the owner of the unsold Prints or, in the alternative, is entitled by contract to 90% of the re-sale value of the Prints."

By order and interlocutory judgment entered October 19, 2011 (the initial judgment), the motion court granted in part and denied in part both Scher's motion and the Gallery's cross motion (*see* 2011 NY Slip Op 34078[U] [2011]). Regarding the ownership of the unsold prints, the court granted Scher's mo-

---

Scher's 10% royalty should be calculated based on sales net of production costs. These arguments do not seem to us to negate entirely the Gallery's claim to have incurred financial risk in producing the prints, but this dispute does not in any event influence our resolution of the issue of the ownership of the unsold prints. We also fail to see the relevance of the fact, highlighted by Scher, that two checks the Gallery issued to the printer were returned dishonored. In the end, the printer (which is not a party to this action) delivered the prints in question.

**6.** Since the dispute concerning the *Long Island* painting is discrete from the other issues raised on this appeal, we shall address the *Long Island* matter separately, at the conclusion of this writing. Scher's entitlement to an accounting is not at issue on this appeal.

tion to the extent of declaring that Scher "is the owner of and entitled to immediate possession of all of the approximately 320 unsold prints of her artwork." At the same time, the court granted the Gallery's cross motion "to the extent of ruling that [the Gallery] is entitled by contract to 90% of the re-[sale] value of the unsold prints, either gross or net of expenses, and the amount, if any, owed to [the Gallery] shall be determined at the plenary trial of this action."

In determining that Scher owns the prints, the motion court adopted Scher's argument that this result is compelled by Arts and Cultural Affairs Law § 12.01 ("Artist-art merchant relationships") as construed by this Court and Supreme Court in *Wesselmann v International Images* (172 Misc 2d 247 [1996], *affd* 259 AD2d 448 [1st Dept 1999]), an earlier case concerning ownership of unsold prints from an artist's paintings that were commissioned and paid for by an art dealer. As in effect at all relevant times (which were before the effective date of a 2012 amendment),[7] section 12.01 (1) provided in pertinent part:

"1. Notwithstanding any custom, practice or usage of the trade, any provision of the uniform commercial code or any other law, statute, requirement or rule, or any agreement, note, memorandum or writing to the contrary:

"(a) Whenever an artist [as defined in section 11.01 (1)] . . . delivers or causes to be delivered a work of fine art, craft or a print [as defined in section 11.01 (14)] of his own creation to an art merchant [as defined in section 11.01 (2)] for the purpose of exhibition and/or sale on a commission, fee or other basis of compensation, the delivery to and acceptance thereof by the art merchant establishes a consignor/consignee relationship as between such artist . . . and such art merchant with respect to the said work, and:

"(i) such consignee shall thereafter be deemed to be the agent of such consignor with respect to the said work;

"(ii) such work is trust property in the hands of the consignee for the benefit of the consignor;

<hr>

**7.** An amendment to section 12.01 enacted by Laws of 2012, chapter 450, does not apply to the relationship between Scher and the Gallery, which had terminated before the amendment's effective date (Nov. 6, 2012).

"(iii) any proceeds from the sale of such work are trust funds in the hands of the consignee for the benefit of the consignor;

"(iv) such work shall remain trust property notwithstanding its purchase by the consignee for his own account until the price is paid in full to the consignor . . . ; and

"(v) no such trust property or trust funds shall be subject or subordinate to any claims, liens or security interest of any kind or nature whatsoever."

The motion court read *Wesselmann* and a number of nisi prius decisions construing section 12.01 to establish that Scher was the owner of the prints because they were works "of h[er] own creation" (§ 12.01 [1] [a]) that, by signing them as the *Wesselmann* artist had signed the prints in that case (*see* 172 Misc 2d at 251), she "deliver[ed] or cause[d] to be delivered" (§ 12.01 [1] [a]) to the Gallery (an art merchant within the meaning of the statute [*see* Arts and Cultural Affairs Law § 11.01 (2)]) "for the purpose of exhibition and/or sale" (§ 12.01 [1] [a]). The Gallery contended that the statute applies only when the artist owns the work as a physical object in the first place and, therefore, did not apply to prints that were physically produced and delivered to the dealer by a third-party contractor that the dealer had commissioned and paid to produce them.[8] In rejecting this argument, the motion court stated:

"[T]he statute, by its terms, applies to 'prints' that the artist 'delivers or causes to be delivered.' In *Wesselmann v International Images, supra,* these terms were held to apply to signed prints of original works of art that, as here, were commissioned by and paid for by the art merchant. In that case, the art merchant argued that there had been no delivery of prints by the artist, but the court rejected that argument, finding that the artist's approval and signing of the finished prints before they were sold constituted delivery within the meaning of Section 12.01 [citing *Wesselmann,* 172 Misc 2d at 251]. The defendants in *Wesselmann* also argued unsuccessfully,

---

**8.** On this point, the Gallery relied on Uniform Commercial Code § 2-401 (2), which provides in pertinent part: "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . ."

as does the Gallery here, that their financial investment in publishing the prints renders the consignment and trust provisions of Section 12.01 inapplicable [citing *id.* at 251-252]." (2011 NY Slip Op 34078[U], *8-9.)

The Gallery sought to distinguish *Wesselmann* on the ground that the relationship between the artist and the dealer in that case was described by this Court, in the decision affirming Supreme Court's determination that the artist owned the prints, as "most closely approximat[ing] a joint venture" (259 AD2d at 449-450). The Gallery contended that the finding in *Wesselmann* that the parties' relationship resembled a joint venture was the basis for the determination that the artist owned the prints (*see Matter of Steinbeck v Gerosa*, 4 NY2d 302, 318 [1958], *appeal dismissed* 358 US 39 [1958] [property contributed to a joint venture is deemed to be held "jointly" by the venturers]), thereby rendering the case distinguishable from this one, in which both Scher and the Gallery strongly deny that their relationship could be characterized as a joint venture. The motion court rejected this argument, pointing out that neither the Appellate Division nor the Supreme Court in *Wesselmann* expressly connected the finding that the artist owned the prints to the finding that the parties' relationship was akin to a joint venture. The motion court further opined that "the particular terms of the parties' agreement is irrelevant" to its determination of the ownership issue because section 12.01 (1) provides that it applies in pertinent part "[n]otwithstanding . . . any agreement, note, memorandum or writing to the contrary." (2011 NY Slip Op 34078[U], *10.)

Although it found that Scher owned the prints, the motion court further held in the initial judgment that Scher's ownership "does not defeat the Gallery's contract right to 90% of their re-sale value." (*Id.* at *14.) In support, the motion court relied on *Wesselmann*, which held that, notwithstanding the determination that the artist owned the prints, the dealer's "claim for its share of the profits upon the sale of the prints still remains to be determined" (172 Misc 2d at 252). In so holding, the motion court rejected Scher's argument that Arts and Cultural Affairs Law § 12.01 barred enforcement of any contractual right that the Gallery might otherwise have to recover any portion of the value of the prints that remained unsold when the parties' relationship terminated.

Scher moved for reargument and renewal of the initial judgment, seeking to have the judgment amended

"to (1) eliminate the Stendhal Gallery's right to any portion of any sale proceeds for the Scher Prints sold after May 11, 2010 and for unsold Scher Prints currently being held in escrow; and (2) require the Stendhal Gallery to pay its share of the Court-ordered escrow costs to the escrow agent forthwith."

The latter relief, for which renewal was sought, was rendered moot when the Gallery voluntarily paid its share of the escrow costs while the motion was pending.[9]

The motion court granted Scher's motion for reargument and, upon reargument, directed that the initial judgment be amended to deny the Gallery's cross motion and to declare that the Gallery "is not entitled by contract or otherwise, to any portion of the value of the 320 unsold prints except for the Gallery's printing costs." The initial judgment was amended accordingly on or about May 9, 2012 (the amended judgment). In its decision granting reargument, the motion court, while it continued to reject Scher's argument that Arts and Cultural Affairs Law § 12.01 bars recognizing any right of the Gallery to a portion of the value of unsold prints, found that the parties' oral agreement concerning the prints "established nothing more than a split of sales proceeds at such time as prints were sold pursuant to the [2005 agreement]." Because it was undisputed that both the 2005 agreement and the oral agreement concerning the prints were terminated on May 11, 2010, the court found that Scher was "entitled to the full list price for all prints sold after May 11, 2010," and that the Gallery was not entitled to any share of the value of the prints that remained unsold at the termination of the relationship. Without explanation, however, the court directed that the amended judgment permit the Gal-

---

**9.** After Scher's motion for reargument and renewal was fully briefed, the Gallery produced the accounting that the motion court had ordered in the initial judgment. Thereafter, Scher made surreply filings, apparently without the court's permission, purportedly in further support of the motion for reargument and renewal, placing the Gallery's accounting before the court on the motion and arguing that the accounting was deficient in various ways. The relevance of the material relating to the accounting to any relief sought either in the original motion and cross motion or in the subsequent reargument and renewal motion is at best dubious. To the extent Scher argues that the accounting material demonstrates that the Gallery committed breaches of contract that justified Scher's termination of the parties' agreements, the Gallery apparently does not dispute that Scher was entitled to terminate the agreements when she did. In any event, contrary to the Gallery's contention, it does not appear that the motion court was significantly influenced by the accounting material in deciding the reargument motion.

lery to recover from Scher "the Gallery's printing costs," presumably meaning the costs of printing the 320 unsold prints as proved at trial.[10]

The Gallery appeals from the amended judgment, arguing, with respect to the unsold prints, that: (1) the Gallery owns the unsold prints by normal operation of commercial law, and nothing in Arts and Cultural Affairs Law § 12.01 is to the contrary; and (2) in the alternative, the Gallery is entitled, by virtue of the oral agreement concerning the prints, to recover from Scher 90% of the resale value of the unsold prints. Scher has also appealed from the amended judgment to the extent (as stated in her notice of appeal) that it "den[ies] Plaintiff's Motion for Partial Summary Judgment, misconstrue[s] New York Arts and Cultural Affairs Law § 12.01 and binding precedent of the Appellate Division, First Department, and fail[s] to grant Plaintiff's Motion to Renew." Upon review of Scher's appellate briefs, it appears that her chief complaint is not about the particular results the motion court reached but about some of the reasoning it employed, which is not a proper basis for an appeal. However, Scher identifies one aspect of the amended judgment by which she arguably is aggrieved, namely, the failure of the amended judgment, apparently inadvertent on the part of the motion court, to specify that Scher is entitled to recover the full list price of prints that the Gallery sold after May 11, 2010, and of prints that are missing or were disposed of by undocumented sales.[11]

■ We turn first to the Gallery's argument that it owns the 320 unsold prints. The Gallery, relying on Uniform Commercial Code § 2-401 (2), contends that it owns the prints by normal operation of law. The Gallery points out that it engaged the printer, paid the printer, and took delivery of the prints from the printer, while Scher had no contractual relationship with the printer, never made any payment to the printer, and never had possession or control of the prints as physical objects. The Gallery further argues that nothing in Arts and Cultural Affairs Law § 12.01 compels a different result, since that statute says nothing about when an artist owns an artwork, as a physical

---

**10.** On appeal, Scher does not challenge the amended judgment's provision allowing the Gallery to recover "printing costs."

**11.** Scher also complains that the motion court did not award her relief with regard to prints that the Gallery sold at unauthorized discounts. However, she never moved for relief on the issue of print sales at unauthorized discounts, and so this argument is improperly raised on appeal.

object, that he or she has created.[12] The statute simply provides, the Gallery argues, that, when an artist *does* have title to an artwork he or she has created, and then delivers the piece to an art merchant for sale, a consignment relationship is created, with the artwork constituting trust property, as opposed to other kinds of commercial arrangements that would offer the artist less protection, such as a "sale or return" or a "sale on approval" under Uniform Commercial Code § 2-326 (*see* Atty General's Mem to Gov, July 21, 1966 at 1, Bill Jacket, L 1966, ch 984 at 4). Indeed, Attorney General Louis J. Lefkowitz, the proponent of the 1966 bill that enacted the predecessor of current Arts and Cultural Affairs Law § 12.01, stated in the above-cited July 21, 1966 memorandum urging approval of the bill that the legislation "clearly spells out that misappropriation of *an artist's property* entrusted to his dealer-agent under the conditions outlined above is unlawful and constitutes larceny in the degree as provided in the Penal Law" (*id.* [emphasis added]).

The foregoing argument seemingly has some cogency, as it would appear anomalous for the law to designate property that did not belong to the artist in the first place as "trust property" for the artist's benefit. The Gallery offers hypothetical examples in which an artist delivers artwork that she created, but clearly did not own, to an art merchant, arguing that to construe the mere act of delivery to trigger section 12.01's application in these situations would lead to absurd results.[13] *Wesselmann*, which presented a limited-edition print scenario similar to the one at issue here, poses obvious difficulties for this approach. As previously noted, however, the Gallery argues that *Wesselmann* can be distinguished based on the fact that the artist and art merchant in that case were found to have had a relationship

---

**12.** [2] In this connection, the Gallery directs our attention to the principle that "[o]wnership of a copyright . . . is distinct from ownership of any material object in which the work is embodied" (17 USC § 202). Thus, that Scher holds the copyright in the prints, and is deemed their creator under the Arts and Cultural Affairs Law (*see* Arts and Cultural Affairs Law § 11.01 [1] [" 'Artist' means . . . in the case of multiples, the person who conceived or created the image which is contained in or which constitutes the master from which the individual print was made"]), does not necessarily mean that she owns the prints as physical objects.

**13.** The hypothetical examples are: (1) an artwork that the artist created, sold directly to a third party, and then delivered to an art merchant at the direction of the third-party owner; and (2) an artwork that an employee-artist created as a work-for-hire for her employer and then delivered to an art merchant at the employer's direction.

akin to a joint venture (259 AD2d at 449-450). Since joint venturers own property committed to the enterprise "jointly" (*Steinbeck*, 4 NY2d at 318), the *Wesselmann* artist's property interest in the prints as physical objects arose from the joint venture, not from the statute. So the Gallery argues.[14]

■ We need not determine whether the Gallery's interpretation of the statute is correct because we find that the written 2005 agreement between Scher and the Gallery specifies that the Gallery was acting with regard to the prints as Scher's "exclusive agent." While the parties agree that the 2005 agreement does not set forth all of the terms of the print deal (in particular, the 90/10 split of the print sales was orally agreed upon at a later time), section 1 of the 2005 agreement ("Scope of Agency") expressly provides that Scher was appointing the Gallery "to act as [her] exclusive agent . . . for the exhibition and sales of . . . limited edition prints published exclusively by [the] [G]allery," among other kinds of artwork, for the duration of the agreement. Thus, when the Gallery commissioned the printer to produce the prints, paid the printer for the prints, and took delivery of the prints, it did so as Scher's agent and, hence, fiduciary (*see Sokoloff v Harriman Estates Dev. Corp.*, 96 NY2d 409, 416 [2001]).[15] Accordingly, the prints must be deemed to be Scher's property (*see Sweet v Jacocks*, 6 Paige Ch 355, 364 [1837] [an agent "cannot be permitted to deal in the matter for that agency upon his own account and for his own benefit"]; *Reed v Warner*, 5 Paige Ch 650, 656 [1836] [same]; 2A NY Jur 2d, Agency § 232 [same]; Restatement [Third] of Agency § 8.02 ["An agent has a duty not to acquire a material benefit from a third party in connection with transactions conducted or other

---

**14.** Similarly, the provision of section 2 of the 2005 agreement that, upon termination of the agreement, the Gallery is to return to Scher "all works consigned hereunder" (an undefined term) does not provide a way of determining whether the prints were deemed to be Scher's property so as to constitute "works consigned hereunder." If the Gallery owned the prints upon taking delivery of them from the printer, the prints would not have been "consigned" by Scher at all.

**15.** *See also* 1 Ralph E. Lerner & Judith Bresler, Art Law at 25 (4th ed 2012) (an agreement establishing a principal-agent relationship between an artist, as principal, and a gallery, as agent, "calls forth the fiduciary responsibility of the gallery to the artist within the context of their relationship; the gallery has a legal obligation to act only in the artist's interest and to forgo all personal advantage aside from the agreed compensation for its services as agent").

actions taken on behalf of the principal or otherwise through the agent's use of the agent's position"]).[16]

As Scher's fiduciary, the Gallery was obligated to disclose to her in plain terms all material facts within the scope of the agency, obviously including any understanding the Gallery had, upon entering with Scher into the oral print deal, that it would own the prints and any intention it entertained to treat the prints as its own property (*see Greenberg, Trager & Herbst, LLP v HSBC Bank USA*, 17 NY3d 565, 579 [2011]; *Rivkin v Century 21 Teran Realty LLC*, 10 NY3d 344, 355 [2008]; *Dubbs v Stribling & Assoc.*, 96 NY2d 337, 340 [2001]). If the Gallery did not wish to finance the production of prints that it would not own, it could have sought to reach an agreement with Scher specifying that prints made at the Gallery's expense would be the Gallery's property. Alternatively, if the Gallery merely wished to protect itself from being abruptly terminated as Scher's agent before it had a fair chance to sell the prints, it could have sought to reach an agreement with her on a minimum time period it would have to sell each batch of prints during which the agency could not be terminated without cause. Instead, the Gallery left itself exposed by going forward with the print deal based on only a vague, unwritten agreement that left nearly all of the terms up in the air except for the basic 90/10 split of sales revenue (and even as to that, there is a dispute as to whether Scher's cut is calculated based on gross or net sales). We see no reason to relieve a fiduciary, such as this professional art merchant, of the consequences of its own carelessness in dealing with its principal.

Although we find that the 2005 agreement's designation of the Gallery as Scher's "exclusive agent" as to the prints suffices to resolve the dispute over the ownership of the unsold prints, we observe that there is little in the record to cast additional light on the parties' specific intentions concerning ownership of the prints at the time of contracting. Scher testified at her deposition that she always believed that she owned the prints but

---

**16.** In view of the 2005 agreement's express provision that any deal for "limited edition prints" would be within the scope of the Gallery's "exclusive agen[cy]" for Scher, the Gallery's contention that the 2005 agreement is completely irrelevant to the print deal is untenable. Moreover, the sentence at the end of the second paragraph of section 1 of the agreement ("In the event of a publishing deal, a separate agreement will be furnished to the artist"), when read in the context of the preceding sentence (stating that the Gallery "will act as the artist's agent to put forth a book deal based on 'The Maps' "), plainly refers to a book publishing deal, not a print deal.

admitted that she had never discussed ownership of the prints with any representative of the Gallery before this action was commenced. Harry Stendhal admitted in his affidavit that his former co-principal at the Gallery, Maya Stendhal, negotiated the agreements with Scher, but he claimed that, in the course of the relationship, Scher "repeatedly told me that the Prints were 'my thing' and that she was not that interested in them," and that she also told him in one conversation that the print license "would be 'like a book deal.' "[17] These fuzzy recollections of alleged off-hand, vague and ambiguous comments cannot overcome the 2005 agreement's express provision that the prints were within the scope of the Gallery's "exclusive agen[cy]" for Scher, especially in view of the 2005 agreement's provision that any modification of its terms must be "in writing and signed by both parties."

Given that the prints are Scher's property, we find no merit in the Gallery's argument that it is entitled to receive 90% of their resale value, however that value might be determined.[18] The agreement was that the parties would split sales revenue from the prints in a certain proportion. As to the unsold prints, there is no sales revenue to which to apply the parties' agreement (see *Indemnity Ins. Co. of N. Am. v Art Students League of N.Y.*, 225 AD2d 398, 399 [1st Dept 1996] [consignee "had only a conditional interest in the painting and would earn a commission only if a sale were consummated"]). The Gallery has made no argument that Scher breached either the 2005 agreement or the oral agreement concerning prints by terminating both agreements on May 11, 2010 (more than a year and a half beyond the stated term of the 2005 agreement), so there is no basis on which to award the Gallery damages for the loss of the benefit of any bargain.[19] Again, if the Gallery considers this situation unfair, it has only itself to blame for failing to negotiate a more

17. At her deposition (which was conducted before the date of Stendhal's affidavit), Scher was asked: "Do you recall telling Mr. Stendhal . . . that the prints were his thing?" She answered, "No."

18. We agree with the motion court, however, that nothing in Arts and Cultural Affairs Law § 12.01 has a bearing on this issue. The statute designates consigned artwork and its proceeds as trust property, but does not generally address monetary rights and obligations between an artist and an art merchant, as we recognized in *Wesselmann*.

19. Indeed, far from claiming that Scher's termination of the agreements was a breach, the Gallery expressly takes the position in its appellate reply brief that it "does not dispute [Scher's] right to terminate the [2005 agreement] any time after its term expired in October 2008 . . . or to terminate the [oral] License Agreement [concerning the prints] at any time whatsoever."

detailed written agreement to govern these matters. We note that Scher has chosen not to challenge on appeal the motion court's determination that she should compensate the Gallery for the production costs of the unsold prints. How such costs should be determined at trial is a question that is not before us.

We have considered the Gallery's remaining arguments concerning ownership of the unsold prints and its alleged right to compensation for those prints and find them unavailing.

Given the determination that Scher owns the unsold prints and has no obligation to reimburse the Gallery for their value, it follows that she is entitled to recover from the Gallery the full list price of any prints that the Gallery sold without authorization after May 11, 2010, as well as the full list price of any prints that are missing or are believed to have been disposed of through undocumented transactions. On Scher's appeal, we modify the amended judgment to provide accordingly. The remaining issues Scher raises on her appeal are matters as to which she is not aggrieved, and therefore lacks standing to appeal, because they involve either (1) disagreements with the motion court's reasoning rather than its result or (2) the motion court's failure to make findings that Scher did not request in her notices of motion.

Finally, we turn to the dispute over the painting *Long Island*, which the 2005 agreement provides was to have been sold for $90,000. As previously noted, section 11 of the 2005 agreement requires all modifications of the agreement to be "in writing and signed by both parties." The complaint, while it asserts a general claim for breach of contract (the fifth cause of action), does not allege that the Gallery sold *Long Island* in breach of the 2005 agreement. When Scher moved for partial summary judgment, however, she represented that she had learned from the Gallery's document production that the Gallery had sold *Long Island* in October 2007 for $50,000, not the contractually specified $90,000.[20] Scher asked the court to "conform the pleadings to the undisputed facts demonstrated by the Gallery's document production," and included in her notice of motion a request for a declaration that she "is entitled to a 50% commission on the agreed-upon price for the Gallery's sale of her painting *Long Island*." The court permitted the amendment, finding

**20.** At her deposition, Scher testified that she had assumed that she "had gotten *Long Island* back" at some point after the 2005 exhibition of the Map I paintings, and that she had not learned that the painting had been sold at all "until we were deep into the case," which had been commenced in June 2010.

that the Gallery would not be prejudiced, and granted Scher summary judgment on this issue, holding that the Gallery owes Scher a $45,000 commission on the sale of *Long Island* because Scher had not agreed in writing to modify the agreed sale price for the painting. The motion court's ruling on this issue was correct.[21]

█ The Gallery argues that Scher is not entitled to summary judgment on the *Long Island* issue because an issue of fact exists as to whether she orally "waived" her right to have the painting sold at the $90,000 price specified by the 2005 agreement. This argument is based entirely on the following three sentences in Harry Stendhal's affidavit opposing Scher's summary judgment motion:

> "I discussed the sale of *Long Island* (including the sale price) with [Scher] shortly after it occurred [in 2007] and [she] did not object. In fact, [Scher] indicated that she believed *Long Island* was her 'worst painting' and she was relieved that it sold. The proceeds of the *Long Island* sale were used, in part, to finance th[e] [second] exhibition [of Scher's works], with [her] agreement."

As a matter of law, these allegations that Scher orally consented, after the fact, to the Gallery's sale of *Long Island* for $50,000, rather than for the contractually specified price of $90,000, cannot overcome the requirement of the parties' written agreement that "[a]ll modifications of this Agreement . . . be in writing and signed by both parties."

General Obligations Law § 15-301 (1) provides that "[a] written agreement . . . which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought . . . ." The Court of Appeals has explained that, under this statute, "if the only proof of an alleged agreement to deviate from a written contract is the oral exchanges between the parties, the writing controls" (*Rose v Spa Realty Assoc.*, 42 NY2d 338, 343 [1977]). While the Court of Appeals also noted in *Rose* that, because section 15-301 (1) "nullifies only 'executory'

---

21. We see no basis for disturbing the motion court's exercise of its discretion to permit the pleadings to be amended to conform to the proof to allow Scher to assert a claim for 50% of the price for *Long Island* stipulated by the 2005 agreement (*see* CPLR 3025 [b]; *Weinstock v Handler*, 254 AD2d 165 [1st Dept 1998]).

oral modification[,] [o]nce executed, the oral modification may be proved" (*id.*), and that partially performed oral modifications are provable "if the partial performance be unequivocally referable to the oral modification" (*id.*), these qualifications do not avail the Gallery because it alleges neither completed execution of, nor partial performance unequivocally referable to, the alleged oral modification. Since the oral modification of the sale price is alleged to have been agreed upon after *Long Island* had been sold, the modification could have been fully executed only by the Gallery's tender, and Scher's acceptance, of payment of a commission for the painting based on the lesser, modified price. The Gallery, however, does not allege that it has made any payment to Scher based on the sale of this painting. Nor does the Gallery allege any other conduct by either party that is "unequivocally referable" (*id.*) to the alleged oral modification so as to constitute partial performance thereof. In particular, the Gallery's use, allegedly with Scher's consent, of some of the proceeds of the *Long Island* sale to finance Scher's second exhibition cannot be deemed unequivocally referable to the alleged oral modification of the painting's sale price.[22]

Accordingly, the amended interlocutory judgment of Supreme Court, New York County (Melvin L. Schweitzer, J.), entered May 9, 2012, which, to the extent appealed from as limited by the briefs, granted plaintiff's motion for partial summary judgment declaring her the owner of and entitled to immediate possession of approximately 320 unsold prints of her artwork being held in escrow and ruling that defendant gallery owes her a $45,000 commission on the sale of her painting *Long Island*, and denied defendants' cross motion for partial summary judgment on their claim to be the owners of the unsold prints or, in the alternative, entitled to 90% of the resale value of the prints, should be modified, on the law, to adjudge and declare that plaintiff is entitled to the full list price for all prints that the Gallery sold after May 11, 2010 and all prints that are missing or believed to have been disposed of through undocumented sales, and otherwise affirmed, with costs to plaintiff. To the extent an appeal is taken from so much of an order and interlocutory judgment, same court and Justice, entered October 19,

---

**22.** The Gallery's reliance on *Nassau Trust Co. v Montrose Concrete Prods. Corp.* (56 NY2d 175 [1982]) is misplaced. *Nassau Trust* held that a unilateral oral waiver of a contractual right is outside the purview of General Obligations Law § 15-301 (1) (56 NY2d at 186). Here, the Gallery is relying on an allegation, not of a unilateral waiver, but that the parties reached a bilateral oral agreement to modify a term of a written agreement.

2011, as amended by an order, same court and Justice, entered May 7, 2012, as denied plaintiff's motion for partial summary judgment, such appeal should be dismissed, without costs, as subsumed in the appeal from the amended judgment.

Tom, J.P., Freedman and Feinman, JJ., concur.

Amended interlocutory judgment, Supreme Court, New York County, entered May 9, 2012, modified, on the law, to adjudge and declare that plaintiff is entitled to full list price for all prints that the Gallery sold after May 11, 2010, and all prints that are missing or believed to have been disposed of through undocumented sales, and otherwise affirmed, with costs to plaintiff. Appeal from order and interlocutory judgment, same court, entered October 19, 2011, as amended by an order, same court, entered May 7, 2012, dismissed, without costs, as subsumed in the appeal from the amended judgment.